Citation Nr: 1513884 
Decision Date: 03/31/15 Archive Date: 04/03/15

DOCKET NO. 09-00 035A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Louisville, Kentucky


THE ISSUES

1. Entitlement to service connection for a disability manifested by dizziness.

2. Entitlement to service connection for residuals of a stroke. 

3. Entitlement to a rating in excess of 10 percent for cranial neuropathy affecting the face, mouth, lips, throat, esophagus, and sense of taste.

4. Entitlement to an initial rating in excess of 60 percent for cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement from December 14, 2004, to June 13, 2006, and from September 1, 2006, to June 12, 2014. 



REPRESENTATION

Appellant represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

G. Wasik, Counsel


INTRODUCTION

The Veteran served on active duty from December 1948 to August 1952, from December 1953 to December 1957, and from February 1958 to November 1971. 

This case comes before the Board of Veterans' Appeals (Board) on appeal from a rating decisions of the Department of Veterans Affairs (VA) Regional Office in Roanoke, Virginia (RO) and the VA RO in Louisville, Kentucky. The Louisville RO is currently the Agency of Original Jurisdiction (AOJ).

Service connection for cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement was granted in a June 2011 rating decision, as secondary to the Veteran's service-connected type II diabetes mellitus. A 60 percent rating was assigned effective December 14, 2004, and continued effective September 1, 2006, following the assignment of a 100 percent rating from June 14, 2006, through August 2006. In an October 2011 rating decision, the Roanoke RO proposed to assign a later effective date for service connection for coronary artery disease, status post myocardial infarction, with an evaluation of 10 percent effective July 2, 2008, and to sever service connection for cardiomyopathy with pacemaker placement as secondary to type II diabetes mellitus from December 14, 2004, due to clear and unmistakable error. Severance of service connection for cardiomyopathy with pacemaker placement, was effectuated in an April 2012 rating decision issued by the Louisville RO. The effective date of the severance was July 1, 2008. A 10 percent rating was assigned for ischemic heart disease effective July 1, 2008. This appeal ensued. In an April 2013 Board decision, it was determined that service connection for cardiomyopathy with pacemaker placement should be restored. An April 2013 decision by the Louisville RO effectuated the Board's decision the same month - restoring service connection for cardiomyopathy with pacemaker placement and also re-characterizing the service connected disability as cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement. The newly characterized disability was assigned a 60 percent disability rating effective from September 1, 2006. 

The issue of entitlement to an increased rating for cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement was last before the Board in December 2014 when it was remanded for additional evidentiary development. While the case was in remand status, a January 2015 rating decision granted an increased rating of 100 percent for the heart disability, effective June 12, 2014.

The Board notes, during the course of this appeal, that the Veteran had also perfected an appeal of the denial of his claim for special monthly compensation based on the need for the aid and attendance of another person. In March 2015, the Appeals Management Center (AMC) granted entitlement to special monthly compensation based on the need for the aid and attendance of another. This is a full grant of benefit sought and this issue is no longer in appellate status. 

The issues of entitlement to service connection for incontinence and for melanoma, entitlement to an increased rating for penis deformity and whether new and material evidence has been received to reopen a claim of entitlement to service connection for tinnitus have been raised by the record in various communications from the Veteran, but have not been adjudicated by the AOJ. Therefore, the Board does not have jurisdiction over them, and they are referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2014). 

The issues of entitlement to service connection for a disability manifested by dizziness, entitlement to service connection for residuals of a stroke, and entitlement to a rating in excess of 10 percent for cranial neuropathy affecting the face, mouth, lips, throat, esophagus, and sense of taste are addressed in the REMAND that follows the ORDER section of this decision. 

The record before the Board consists of electronic records within Virtual VA and the Veterans Benefits Management System.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 


FINDING OF FACT

From December 14, 2004 to June 13, 2006, and from September 1, 2006 to June 12, 2014, the service connected cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement was not productive of chronic congestive heart failure, an ejection fraction of less than 30 percent or a workload of 3 METS or less resulting in dyspnea, fatigue, angina, dizziness or syncope. 


CONCLUSION OF LAW

The criteria for rating in excess of 60 percent for cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement, have not been met at any time during the appeal period. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.104, Diagnostic Codes 7005, 7020 (2014).


REASONS AND BASES FOR FINDING AND CONCLUSION

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2014), and the pertinent implementing regulation, codified at 38 C.F.R. § 3.159 (2014), provide that VA will assist a claimant in obtaining evidence necessary to substantiate a claim but is not required to provide assistance to a claimant if there is no reasonable possibility that such assistance would aid in substantiating the claim. They also require VA to notify the claimant and the claimant's representative, if any, of any information, and any medical or lay evidence, not previously provided to the Secretary that is necessary to substantiate the claim. As part of the notice, VA is to specifically inform the claimant and the claimant's representative, if any, of which portion, if any, of the evidence is to be provided by the claimant and which part, if any, VA will attempt to obtain on behalf of the claimant. 

The Board also notes that the United States Court of Appeals for Veterans Claims (Court) has held that the plain language of 38 U.S.C.A. § 5103(a), requires that notice to a claimant pursuant to the VCAA be provided "at the time" that, or "immediately after," VA receives a complete or substantially complete application for VA-administered benefits. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). The Court further held that VA failed to demonstrate that, "lack of such a pre-AOJ-decision notice was not prejudicial to the appellant, see 38 U.S.C. § 7261(b)(2) (as amended by the Veterans Benefits Act of 2002, Pub. L. No. 107-330, § 401, 116 Stat. 2820, 2832 ) (providing that "[i]n making the determinations under [section 7261(a)], the Court shall . . . take due account of the rule of prejudicial error")." 

The timing requirement enunciated in Pelegrini applies equally to the initial-disability-rating and effective-date elements of a service-connection claim. Dingess/Hartman v. Nicholson 19 Vet. App. 473 (2006). 

The record reflects that the Veteran was provided all required notice in a letter sent in August 2010, prior to the initial adjudication of the claim.

The duty to assist the Veteran has also been satisfied. The Veteran's service treatment records, as well as identified private and VA medical treatment records, have been obtained. The Veteran has been afforded appropriate VA examinations to evaluate the disability on appeal. The examiners who conducted the most recent examinations had access to and reviewed the evidence of record. They provided all information required for rating purposes. The Veteran has not identified any outstanding evidence that could be obtained to substantiate his claim. The Board is also unaware of any such evidence. 

Accordingly, the Board will address the merits of the Veteran's claim.

Legal Criteria

Disability ratings are determined by applying the criteria established in VA's Schedule for Rating Disabilities, which is based upon the average impairment of earning capacity. Individual disabilities are assigned separate Codes. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.1, 4.20 (2014). 

An evaluation of the level of disability present also includes consideration of the functional impairment of the veteran's ability to engage in ordinary activities, including employment. 38 C.F.R. § 4.10 (2014).

In both initial rating claims and normal increased rating claim, the Board must discuss whether "staged ratings" are warranted and if not why not. Fenderson v West, 12 Vet App 119 (1999); Hart v Mansfield, 21 Vet. App 505 (2007).

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary. The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of the matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107 (West 2014); 38 C.F.R. §§ 3.102, 4.3 (2014); see also Gilbert v. Derwinski, 1 Vet. App. 49, 53(1990). 

Under Diagnostic Code 7005 which provides the rating criteria for arteriosclerotic heart disease to include coronary artery disease and Diagnostic Code 7020 which provides the rating criteria for cardiomyopathy, a 60 percent evaluation is warranted when there is more than one episode of acute congestive heart failure in the past year, or when a workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope; or where there is left ventricular dysfunction with an ejection fraction of 30 percent to 50 percent. The maximum 100 percent evaluation is assigned for chronic congestive heart failure; when there is a workload of 3 METs or less which results in dyspnea, fatigue, angina, dizziness, or syncope; or when there is left ventricular dysfunction with an ejection fraction of less than 30 percent. 38 C.F.R. § 4.104 , Diagnostic Codes 7005 and 7020 (2014). 

One MET is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for evaluation, and a laboratory determination of METs by exercise testing cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 38 C.F.R. § 4.104 , Note (2).

Factual Background

In accordance with 38 C.F.R. §§ 4.1, 4.2 (2014) and Schafrath v. Derwinski, 1 Vet. App. 589 (1991), the Board has reviewed all evidence of record pertaining to the history of the service-connected disability. The Board has found nothing in the historical record which would lead to the conclusion that the current evidence of record is not adequate for rating purposes. Moreover, the Board is of the opinion that this case presents no evidentiary considerations which would warrant an exposition of remote clinical histories and findings pertaining to this disability. 

A private clinical record dated in December 2004 references an ejection fraction of 40-45%. A catheterization was performed. Another record dated the same month references an ejection fraction of 35-40%. 

In January 2005, it was written by a private physician that the Veteran had a history of an ejection fraction of 40%. 

A private clinical record dated in February 2005 includes the annotation that the Veteran's ejection fraction had improved from 35-40% to approximately 45%. 

A private clinical record dated in June 2005 reveals the Veteran's ejection fraction was 45 percent and he had a history of an ejection fraction of 40 percent. 

A private clinical record dated in September 2005 includes the annotation that the Veteran has congestive heart failure. A pertinent assessment is congestive heart failure. 

The report of a December 2005 VA diabetes examination reveals the Veteran had an ejection fraction of 45%. 

An echocardiogram which was conducted in April 2006 was interpreted as revealing left ventricular systolic function which was normal and an ejection fraction of 50-55%.

In June 2006, a private physician wrote that the Veteran's ejection fraction was almost back to normal. 

In October 2006, a private physician wrote that the Veteran has an ejection fraction of 40-45%. There was no reference to the presence of congestive heart failure. 

In August 2007, a private clinical record references an ejection fraction of 40-45%. It was noted that the Veteran was receiving multiple medications for congestive heart failure. 

An echocardiogram which as conducted in March 2008 demonstrated an ejection fraction of 55-60%. 

In May 2009, a private cardiologist wrote that the Veteran has chronic atrial fibrillation and diabetes and the likely course for people with this is congestive heart failure later in life but, at this point, the Veteran had diastolic heart failure but no systolic heart failure. The ejection fraction was 55%. 

Testing conducted in July 2009 disclosed an ejection fraction of 55-60%. 

A July 2009 private clinical record includes an assessment of known coronary artery disease with diastolic heart failure. There was no mention of congestive heart failure. 

September 2009 stress testing revealed the Veteran achieved a maximum of 1 METS. It was noted that the Veteran was unable to walk due to degenerative joint disease. The conclusion was that it was a nondiagnostic stress test. 

A February 2010 record from Heart Care Associates includes current diagnosis of dizziness, abnormal EKG, diabetes mellitus, long term use of anticoagulants, hypertension, atrial fibrillation and dyspnea. There was no mention of congestive heart failure. 

At the time of an April 2010 VA heart examination it was referenced that an echocardiogram conducted in July 2009 revealed an ejection fraction of 55-60%. The examiner's review of the records resulted in a determination that there was no ongoing congestive heart failure documented in the records. The Veteran reported ongoing problems with shortness of breath and dyspnea on exertion as well as frequent chest tightness and pressure. The examiner opined that the Veteran had a historical exertional capacity of METS 3 to 3.5 on average based on review of exercise activities and metabolic equivalent questionnaire. Exercise testing was contraindicated due to the ejection fraction of less than 50%. The pertinent diagnosis was chronic paroxysmal atrial fibrillation with tachycardia and secondary cardiomyopathy with left ventricular dysfunction. The examiner observed that the Veteran's condition seemed stable if not improved at the time of the examination. 

In October 2010, a physician completed an Ischemic Heart Disease Disability Benefits Questionnaire wherein he specifically indicated that the Veteran did not have congestive heart failure and there was no chronic congestive heart failure. The Veteran's ischemic heart disease did not impact the Veteran's ability to work. It was also noted that the level of METS the Veteran could perform in September 2009 was 1.0 METS. 

An April 2011 private clinical record includes a pertinent assessment of congestive heart failure, probable acute systolic decompensated congestive heart failure.

The report of a September 2011 VA examination includes an assessment that the Veteran's METS equivalent would be 5-7. 

At the time of a May 2013 VA cardiac examination, the examiner indicated that the Veteran had congestive heart failure in the past but did not have it at the time of the examination. He had been hospitalized for 30 days for congestive heart failure and fractured ribs in 2011. The examiner also indicated that the Veteran had not had an episode of acute congestive heart failure in the past year. A pertinent diagnosis of congestive heart failure was noted. The Veteran indicated a historical exertional capacity of 3 to 3.5 METS on average based on a review of the exercise activities and METS questionnaire. Interview based METS testing was >3-5 METS. The examiner opined the METS level limitation was not due solely to the heart conditions. The percentage of METS level limitation which was due solely to the heart condition or conditions was 70%. 30% of the METS was due to obesity. The examiner opined that the heart disability did not impact the Veteran's ability to work. 

An addendum to the May 2013 VA examination was prepared in July 2013. Diagnoses of minimal nonobstructive coronary artery disease in the left circuflex and severe left ventricular diastolic dysfunction were made. It was written that an echocardiogram from January 2011 showed an ejection fraction of 55%. 

A June 2013 private clinical record references the results of an echocardiogram which indicated normal left ventricular systolic function with an ejection fraction of 55%. 

A February 2014 private clinical record includes the annotation that the Veteran had a history of congestive heart failure. 

A March 2014 VA clinical record includes an assessment of acute diastolic congestive heart failure. 

An April 2014 VA clinical record includes congestive heart failure in the Veteran's problems list. 

The report of a June 2014 VA examination includes an assessment that the Veteran had chronic congestive heart failure. 

Analysis

The Board finds that an increased rating to 100 percent is not warranted at any time during the appeal period based on METS testing. In September 2009, a stress test was conducted by a private health care provider. The report of the test includes the annotation that the Veteran was able to achieve a work level maximum of 1 METS. However, it was opined that the test was "nondiagnostic" due to the Veteran's degenerative joint disease. The October 2010 Ischemic Heart Disease questionnaire also references the September 2009 finding. The examiner who conducted the April 2010 VA examination provided an estimate of METS of 3 to 3.5 based his examination of the Veteran and the evidence of record. The Board places greater probative weight on the findings included in the report of the April 2010 VA examination regarding METS capacity. This examiner had access to the claims file and provided an opinion based on his review of the evidence and examination of the Veteran. The METS reported in September 2009 was based on a test which was described as being "non-diagnostic" and without any other qualification as to why it was determined that the METS were so low at that time. METS testing conducted in September 2011 indicated that the Veteran's METS level was 5-7 METS. In May 2013, it was determined that the Veteran's METS was 3-3.5 and this estimate was also based on a review of the evidence and examination of the Veteran. Significantly, this examiner also provided an opinion as to the extent of METS limitation which was due to the service connected cardiac disability and what was due to non-service connected obesity. The examiner opined that 30% of the Veteran's METS limitation was due to his non-service connected obesity. 

The Board notes that a workload of 3 METs or less which results in dyspnea, fatigue, angina, of syncope warrants a 100 percent evaluation under Diagnostic Codes 7005-7020. While the Veteran's METS scores in April 2010 and May 2013 included METS estimates of 3 to 3.5, the examiner who conducted the May 2013 VA examination was the only examiner who attempted to determine the extent of impairment of METS due solely to the service-connected cardiac disorder. The examiner opined that 70 percent of the restriction was due to the cardiac disability and 30 percent of the restriction was due to obesity. When this evidence is taken into account, the METS level attributable to the service-connected disability is greater than 3. The Board finds the rationale would be the same for the April 2010 VA examination. The Veteran has been diagnosed as being obese since prior to the April 2010 VA examination. Based on the above, the Board finds that an increased rating is not warranted for the service-connected cardiac disability based on the presence of a workload of 3 METS or less resulting in dyspnea, fatigue, angina, dizziness or syncope. 

An increased rating is not warranted at any time based on the Veteran's ejection fraction. As set out in the evidence above, many clinical records and reports of VA examinations reference the Veteran's ejection fraction. These readings range from a low of 35 percent in December 2004 to highs of 60 percent. Significantly, none of the clinical records or reports of VA examinations pertinent to the appeal period include any evidence indicating that the Veteran's left ejection fraction was 30 percent or less. 

An increased rating is not warranted for the service-connected cardiac disability based on the presence of chronic congestive heart failure. The medical records dated during the pertinet time period, for the most part, do not document the presence of chronic congestive heart failure. The very few references to the pathology does not indicate that the Veteran had chronic congestive heart failure. A September 2005 private clinical record from the Veteran's primary care physician includes an assessment of congestive heart failure. It is not apparent upon what basis the assessment of congestive heart failure was made. A record from the same physician, dated one month prior, is totally silent as to the presence of congestive heart failure. This was not included as an assessment in the physician's records from August 2005 or June 2005. It is, however, referenced in April 2005. The majority of the physician's (Dr. M.A.T.) clinical records are silent for any references to congestive heart failure. Significantly, clinical records from Heart Care Associated, dated around 2005, are completely silent as to the presence of congestive heart failure. These records reference Dr. M.A.T. as being the Veteran's primary physician. The Board finds that, if the Veteran had had congestive heart failure in September 2005, the contemporaneous clinical records generated as a result of the Veteran's treatment for cardiac problems would have referenced the presence of congestive heart failure. To the extent that the Veteran might have had congestive heart failure in September 2005, this pathology could not be considered chronic as congestive heart failure is not referenced again in any medical records until April 2011 at which time congestive heart failure was diagnosed. Significantly, the congestive heart failure diagnosed in April 2011 was specifically determined to be acute as opposed to chronic. Supporting this finding that the 2011 symptomology was acute as opposed to chronic, the Board notes that, in April 2010, a VA examiner reviewed the medical evidence and opined that there was no ongoing congestive heart failure documented in the records. The examiner who conducted the May 2013 VA examination noted that the Veteran had congestive heart failure in 2011 and that he had not had an episode of acute congestive heart failure in the past year. On a history of congestive heart failure was referenced in the February 2014 clinical record and the congestive heart failure noted in the March 2014 clinical record was characterized as being acute and not chronic. The April 2014 clinical record includes a reference to congestive heart failure in the problem list but does not indicate whether it was chronic or acute. Based on the above, and reading the evidence in the light most favorable to the Veteran, the Board finds the evidence demonstrates that the Veteran had, at most, congestive heart failure in September 2005, in April 2011 and in March 2014. The Board finds this fact pattern does not document the presence of chronic congestive heart failure but rather episodes of acute congestive heart failure. The Board notes that no health care professional has indicated that the Veteran has had chronic congestive heart failure during the period of this appeal. Two of the clinical records actually use the words acute to characterize the congestive heart failure. 

The Board also has considered whether the claim should be referred to the Director of the Compensation and Pension Service for extra-schedular consideration. In determining whether a case should be referred for extra-schedular consideration, the Board must compare the level of severity and the symptomatology of the claimant's disability with the established criteria provided in the rating schedule for disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is therefore adequate, and no referral for extra-schedular consideration is required. Thun v. Peake, 22 Vet. App. 111, 115 (2008).

Here, the rating criteria used to evaluate the cardiac disability reasonably describe the appellant's disability level and symptomatology and provide for additional or more severe symptoms than currently shown by the evidence; thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. The rating criteria used specifically accounts for the Veteran's complaints of dyspnea and fatigue as well as the effect this symptomology has on the Veteran's life (via METS testing). Consequently, referral for extra-schedular consideration is not warranted.

In reaching this decision, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable to the current claim because the preponderance of the evidence is against the claim.






ORDER

Entitlement to an initial rating in excess of 60 percent for cardiomyopathy with coronary artery disease, status post myocardial infarction and pacemaker placement from December 14, 2004, to June 13, 2006, and from September 1, 2006, to June 12, 2014, is denied. 


REMAND

The Board's review of the Veteran's voluminous correspondence reveals there are several outstanding claims which require the preparation of a statement of the case in order to allow him to perfect some appeals. 

A June 2013 rating decision denied a rating in excess of 10 percent for cranial neuropathy affecting the face, mouth, lips, throat, esophagus, and sense of taste. At the same time, the RO also denied a claim of entitlement to service connection for a disorder manifested by loss of balance and dizziness. The RO also denied the Veteran's claim for special monthly compensation based on the need for the aid and attendance of another. The same month, the Veteran's representative submitted a notice of disagreement with all the issues addressed in the June 2013 rating decision. The aid and attendance claim was subsequently granted. No statement of the case, however, has been promulgated concerning the claim of entitlement to a rating in excess of 10 percent for cranial neuropathy affecting the face, mouth, lips, throat, esophagus, and sense of taste or for the claim of entitlement to service connection for a disorder manifested by loss of balance and dizziness. 

In July 2014, the RO denied service connection for residuals of a stroke. In October 2014, the Veteran submitted a document which has been construed as a notice of disagreement with the July 2014 denial of service connection for residuals of a stroke. No statement of the case has been promulgated with regard to this issue.

As the AOJ has not yet issued a statement of the case addressing these issues, the Board must remand these issues for the RO or the AMC to issue a statement of the case on these new issues. See Manlincon v. West, 12 Vet. App. 238, 240-41 (1999). 

Accordingly, the case is REMANDED to the RO or the AMC in Washington, D.C. for the following action:

Issue a statement of the case addressing the claims of entitlement to service connection for a disorder manifested by loss of balance and dizziness, entitlement to service connection for residuals of a stroke, and entitlement to a rating in excess of 10 percent for cranial neuropathy affecting the face, mouth, lips, throat, esophagus. The Veteran must be advised of the requirements to perfect an appeal with respect to these new issues. If the Veteran perfects an appeal with respect to any of these issues, the RO or the AMC should ensure that all indicated development is completed before the case is returned to the Board. 

By this remand, the Board intimates no opinion as to any final outcome warranted.

The Veteran and his representative need take no action until he is otherwise notified, but he may furnish additional evidence and/or argument during the appropriate time frame. See Kutscherousky v. West, 12 Vet. App. 369 (1999).

As noted above this case has been advanced on the Board's docket. It must also be handled in an expeditious manner by the RO or the AMC. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).


______________________________________________
Shane A. Durkin 
Veterans Law Judge, Board of Veterans' Appeals
Department of Veterans Affairs